# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRENDA KATZ, On Behalf of Herself and<br>All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PERSHING, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.<br><br>CLASS ACTION COMPLAINT |

## JURY TRIAL DEMANDED

Plaintiff Brenda Katz ("Katz" or "Plaintiff"), by her undersigned attorneys, Robbins Geller Rudman & Dowd LLP and the Law Offices of Calvacca Moran, on behalf of herself and all similarly situated persons, brings this action against defendant Pershing LLC ( "Pershing" or "Defendant") and alleges the following based upon personal knowledge as to her and her own acts, and information and belief as to all other matters, through *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the publicly available documents of Pershing and information obtained from former employees of Pershing. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This class action complaint seeks monetary and equitable relief pursuant to the Massachusetts Unfair and Deceptive Trade Practices Act, G.L. c. 93A, *et seq.* ("Mass. 93A"), as well as similar deceptive trade practices statutes and consumer protection statutes in effect in other states nationwide (collectively, the "Unfair Trade Practices Statutes"). The complaint also seeks recovery for damages arising from breach of contract, negligence and unjust enrichment on behalf of Plaintiff and all similarly situated persons in the United States ("Class," as more particularly defined in ¶¶49-51, *infra*).

2.     This class action arises from Pershing's reckless, improper and/or unlawful failure to safeguard the non-public, personal information (*e.g.*, social security and tax identification numbers, date and place of birth, net worth, mother's maiden name, bank account numbers and balances and digitized signatures) (hereinafter, "NPPI" or "Personal Information") of Plaintiff and the Class. As alleged herein, Pershing violated the Unfair Trade Practices Statutes by falsely marketing the privacy safeguards associated with its products and services and/or willfully failing to disclose material facts regarding the known security deficiencies of its products and services.

## JURISDICTION AND VENUE

3.     The Court has original jurisdiction over this matter, pursuant to 28 U.S.C. §1332(d), in that the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action of more than 100 potential Class members in which the citizenship of at least one proposed Class member is different from that of at least one defendant.

4.     Venue properly lies in this District pursuant to 28 U.S.C. §1391(a), because Plaintiff and Defendant reside, are found, have an agent, or have transacted substantial business within the District of Massachusetts within the meaning of 28 U.S.C. §1391(a) as defined in 28 U.S.C. §1391(c), and because a substantial part of the events giving rise to the claims alleged herein occurred in the District of Massachusetts.

## PARTIES

5.     Plaintiff Katz is a resident of Middlesex County, Commonwealth of Massachusetts. Plaintiff's Personal Information, through her account with National Planning Corporation ("NPC"), has been entrusted to Defendant.

6.     Defendant Pershing, a single member Delaware limited liability company, is an indirect wholly-owned subsidiary of The Bank of New York Mellon Corporation. Pershing has over $831 billion in assets held in custody. Pershing is registered as a securities broker-dealer with the Securities and Exchange Commission ("SEC") authorized to engage in omnibus clearing, sales and trading and brokerage services and is a member of the New York Stock Exchange ("NYSE") and other regional exchanges. Pershing is a self-described leading global provider of clearing, execution and financial business solutions to more than 1,150 institutional and retail financial organizations including independent broker-dealers and registered investment advisors (together, "Financial Organizations"), that collectively represent over five million active investors. Pershing maintains an office in Quincy, Massachusetts and is licensed to conduct business, and does conduct business, in

- 2 -

Massachusetts. Pershing's citizenship is that of its corporate parent, The Bank of New York Mellon Corporation.

7.    The Bank of New York Mellon Corporation ("BNY") is a publicly traded corporation and is one of the largest asset management and financial services companies in the world with $21.8 trillion in assets under its custody and administration.    BNY is incorporated in Delaware, headquartered in New York City and maintains offices in Boston and Quincy, Massachusetts.

## SUBSTANTIVE ALLEGATIONS

8.    Beginning in or before January 2001 through the present, Plaintiff and members of her family (on whose behalf she has acted) had and continue to have certain financial assets managed by NPC, one of the Financial Organizations that utilizes the clearing and data management services of Pershing.  The fees charged by Pershing for said services are, upon information and belief, borne by Plaintiff and the Class.

9.    In connection with the management of these assets, Plaintiff and the Class entrusted Pershing with their Personal Information. Pershing made certain false representations, more fully described below, which assured that Personal Information would be kept confidential and secure, including as provided by applicable law.  Contrary to such assurances, Pershing failed to secure Personal Information in violation of those laws designed specifically to protect consumers and the general public.

## NET Exchange Pro™

10.    From at least January 2001 through the present, in connection with servicing approximately 1,150 Financial Organizations and their respective retail customers (including Plaintiff and the Class), as well as BNY's retail customers (collectively, the "Retail Customer(s)"), Pershing used and continues to use a proprietary internet application of an operational and support system known as NET Exchange Pro™ ("NETX-Pro").

11.    NETX-Pro is the primary platform for Pershing's business model and is an important source of revenue. NETX-Pro permits internet access to Personal Information furnished to Pershing or the Financial Organizations by Retail Customers (including Plaintiff and the Class).

12.    Employees of both Pershing and Financial Organizations (collectively, "End-Users") use Pershing's internet application of NETX-Pro on their personal home computers, or other off-site computers and devices ("Off-Site Device(s)"), and have access to almost all of their respective organization's mainframe-hosted records, as well as scanned or digitized document repositories, including Personal Information of more than 5,000,000 Retail Customers.

13.    Pershing encourages its Financial Organizations to input their clients' Personal Information into NETX-Pro. In doing so, Pershing promotes the wireless access to, and portability of, Personal Information through NETX-Pro. NETX-Pro does not, however, afford adequate end-point encryption or security protocols.

14.    As many as 100,000 End-Users have around-the-clock access to the Retail Customers' Personal Information from Off-Site Devices without adequate information technology ("IT") security provisions. Weak end-point data security protocols are utilized by Pershing for NETX-Pro, while more robust IT security provisions are mandated for BNY and Pershing-owned computers and laptops. Moreover, upon information and belief, this access to Personal Information has not been limited to those End-Users who were authorized by their employers to view such Personal Information.

15.    Because Pershing fails to manage or control the data containing Personal Information after transmission to End-Users working from Off-Site Devices, such Personal Information data can be "saved" or improperly stored without encryption and even without the End-User's knowledge. At that point, unencrypted Personal Information data is subject to retransmission by malicious agents

- 4 -

(*i.e.*, spyware or bots) without the knowledge of the End-Users. The data containing Personal Information can also be downloaded, unlawfully and without encryption, by the End-User irrespective of his entitlement to view such data.

16.     The download of Personal Information through NETX-Pro's internet application creates a permanent record of the unencrypted data on the Off-Site Device. The recordation of data renders Personal Information unsecure. Thereafter, anyone with access to the device has direct access to Personal Information of the Retail Customers. This access is, by itself, an enormous and unacceptable compromise of the integrity and confidentiality of Personal Information, thereby exposing Retail Customers to identity theft and fraud. That risk continues unabated until the device or hard drive is physically destroyed or professionally scrubbed.

**Massachusetts Privacy Standards**

17.     In October 2007, the Commonwealth of Massachusetts enacted General Laws, Chapter 93H ("Mass. 93H"). Mass. 93H sets forth the basic framework for standards of privacy and authorizes the promulgation of rules and regulations concerning the handling of non-public, Personal Information. Under Mass. 93H, a breach of security is defined as:

[T]he unauthorized acquisition or unauthorized use of unencrypted data. . . . that is capable of compromising the security, confidentiality, or integrity of personal information, maintained by a person or agency that creates a substantial risk of identity theft or fraud against a resident of the commonwealth. A good faith but unauthorized acquisition of personal information by a person or agency, or employee or agent thereof, for the lawful purposes of such person or agency, is not a breach of security unless the personal information is used in an unauthorized manner *or subject to further unauthorized disclosure*.

(Emphasis added).

18.     Thereafter, the Massachusetts Office of Consumer Affairs and Business Regulation, pursuant to Mass. 93H, promulgated Standards for the Protection of Personal Information of

- 5 -

Residents of the Commonwealth. *See* 201 C.M.R. 17.01, *et seq.* ("Massachusetts Privacy Standards"). The stated objectives of the Massachusetts Privacy Standards are:

[T]o insure the security and confidentiality of customer information ***in a manner fully consistent with industry standards; protect against anticipated threats or hazards to the security or integrity of such information; and protect against unauthorized access to or use of such information that may result in substantial harm or inconvenience to any consumer***.

201 C.M.R. 17.01 (emphasis added).

19.     Pershing owns or maintains Personal Information of Massachusetts residents and electronically stores or transmits such information through wireless means and, therefore, is subject to the Massachusetts Privacy Standards.    Pershing violated and continues to violate the Massachusetts Privacy Standards through the absence of any end-point management of wirelessly transmitted data containing Personal Information, including, but not limited to, failure to: (a) employ secure user authentication protocols and access control measures; (b) encrypt Personal Information on laptops and other portable devices; and/or (c) monitor the unauthorized access to Personal Information from such portable devices. *See* 201 C.M.R. 17.04.

20.     The Massachusetts Privacy Standards establish that NETX-Pro, in its present form, is not in compliance with Massachusetts law (or existing industry norms). By itself, the storing of unencrypted Personal Information on an unsecured device, which creates a substantial risk of identity theft or fraud and which has occurred innumerable times through NETX-Pro, is an invasion or injury to the legally protected privacy interests of Plaintiff and the Class. That compromise of security, confidentiality and integrity of Personal Information and the resulting increased risk of identity theft or fraud constitute a cognizable loss or harm to Plaintiff and the Class, which is actionable under Mass. 93A.

## Unfair and Deceptive Trade Practices

21. Pershing willfully failed to disclose to the public and Retail Customers (including

Plaintiff and the Class) material facts regarding the known security deficiencies of NETX-Pro. In

fact, Pershing affirmatively misrepresented to the public and Retail Customers both its general

privacy policies and the safeguards and security features of NETX-Pro.

The "Privacy Policy" posted on Pershing's website underscores the following:

Protecting the confidentiality of your nonpublic personal information is of paramount importance to Pershing. As such, Pershing maintains high industry standards in protecting and safeguarding such nonpublic personal information.

\*    \*    \*

How does Pershing protect your personal information?

- Internal data security policies restrict access to nonpublic personal information to authorized associates. Pershing maintains physical, electronic, and procedural safeguards that are designed to comply with federal standards to guard nonpublic personal information. Associates who violate these policies are subject to disciplinary action, up to and including termination.

- Pershing trains and educates our employees in the handling and safeguarding of personal information in accordance with applicable laws, rules, and regulations.

*See* http://www.pershing.com/privacy_policy.html.

\*    \*    \*

In addition, Pershing ensures all data through comprehensive security methods, extensive back-up systems, and well-developed contingency plans safeguard your personal data and account information. Since privacy, confidentiality, and identity protection are of such critical importance, we maintain stringent physical, electronic, and procedural safeguards.

*See* http://www.pershing.com/events/insite/articles/consolidation-change-for-better.html.

Further, Pershing highlights the security of NETX-Pro through a bulletin linked to the log-on

screen for NETX-Pro, which reads:

- 7 -

**Latest in Account Security!**

> NetExchange® provides investment professionals with private, secure communications. Our clients' confidential account information and transactions are secured (encrypted) with the latest Netscape Secure Commerce Server technology, the best in the industry. Additionally, professionals are required to access their accounts using one of the latest secure browsers such as Netscape Navigator (version 6.1 or higher) or Microsoft's Internet Explorer (version 4.0 or higher).

*See* https://www2.pershingprimeservices.com/homeaboutsit_prime.htm.

22.     These misrepresentations and false promises were made to assuage Pershing's Financial Organizations and Retail Customers (including Plaintiff and the Class) and to promote and foster Pershing's business. Upon information and belief, Pershing knew these representations were false. Pershing's lack of privacy safeguards and its false assurances to the contrary constitute violations of the privacy requirements of SEC Regulation S-P (17 C.F.R. Part 248), the Gramm-Leach-Bliley Act, Federal Trade Commission ("FTC") Safeguards and Privacy Rules, Section 5(a) of the FTC Act, and Massachusetts law.

23.     Mass. 93A provides that any violation of a statute that does not, in and of itself, permit private recovery may give rise to a private claim under Mass. 93A if: (a) the violation amounts to an unfair or deceptive practice independently prohibited by Mass. 93A, §2; and (b) recovery under Mass. 93A is compatible with the objectives and enforcement mechanisms of the underlying statute.

24.     By falsely marketing and misrepresenting that NETX-Pro contains state-of-the-art privacy safeguards, and/or willfully failing to disclose its known security deficiencies, Pershing engaged in an unfair or deceptive trade practice under Mass. 93A, §2. The losses suffered by Plaintiff and the Class are directly attributable to Defendant's conduct and were foreseeable. Accordingly, Defendant's violation of the standards set forth in Mass. 93H and the Massachusetts

Privacy Standards and Defendant's misrepresentations and/or non-disclosures regarding same are actionable under Mass. 93A, §9.

25. Notwithstanding the fact that Pershing is (and has been) well aware of the lack of privacy safeguards and systemic security issues related to NETX-Pro, Pershing continues the unfair and deceptive trade practices identified in this complaint so as to avoid any disruption to its ongoing business or to the servicing of BNY's client base.

## Significance of Protecting the Personal Information of Plaintiff and the Class

26. Consumers have a vested interest in protecting their Personal Information, such as bank account information, credit card and debit card information, social security and tax identification numbers, asset data and estate information.

27. The compromise of one or more of these items of Personal Information has deleterious impacts on consumers. For example:

(a) The compromise of credit or debit card information, while wearisome on consumers, can generally be remedied with little or no financial loss to consumers (e.g., through cancellation of the account number or reissuance of the card);

(b) The compromise of bank account or asset information, however, can cause immediate financial harm to an impacted consumer and cannot easily be reversed;

(c) What is worse, the compromise of a social security number can place the impacted consumer at risk for identity theft for an infinite period of time.

28. In June 2007, the United States Government Accountability Office ("GAO") issued a report entitled "Personal Information – Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown" (the "2007 Report"). The 2007

- 9 -

Report addressed different types of identity theft and, specifically, highlighted the gravity of

compromised social security numbers in the following manner:

> There are two primary forms of identity theft. First, identity thieves can use financial account identifiers, such as credit card or bank account numbers, to take over an individual's existing accounts to make unauthorized charges or withdraw money. Second, thieves can use identifying data, which can include such things as SSNs and driver's license numbers, to open new financial accounts and incur charges and credit in an individual's name, without that person's knowledge. ***This second form of identity theft is potentially the most damaging because, among other things, it can take some time before a victim becomes aware of the problem, and it can cause substantial harm to the victim's credit rating***.

(Emphasis added).

29.     The 2007 Report further acknowledged that a compromised or stolen social security

number can harm the impacted consumer for several years:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

30.     The GAO's June 17, 2009 report entitled "Identity Theft – Governments Have Acted

to Protect Personally Identifiable Information, but Vulnerabilities Remain" (the "2009 Report")

added that "[p]rotecting personally identifiable information. . . . such as names, date of birth and

SSNs, is critical because its loss or unauthorized disclosure can lead to serious consequences for

individuals."

31.     The significant impact identity theft can have on consumers and the extreme financial

hardships that the failure to secure Personal Information can cause has led to the enactment of

numerous federal privacy-related laws aimed toward protecting consumer information and disclosure

requirements, including, for example: (1) Gramm-Leach-Bliley Act; (2) Fair Credit Reporting Act;

(3) Fair and Accurate Credit Transactions Act; (4) FTC Act, 15 U.S.C. §§41-58; (5) Driver's Privacy

Protection Act; (6) Health Insurance Portability and Accountability Act; (7) The Privacy Act of

1974; (8) Social Security Act Amendments of 1990; (9) E-Government Act of 2002; and (10) Federal Information Security Management Act of 2002.

32. Consumers are at the mercy of the security measures or controls utilized by the entities that use or maintain their Personal Information. Consumers have no ability to ascertain whether their Personal Information is being adequately protected or, worse, if their Personal Information has been compromised in any way. *See, generally*, 2009 Report. Hence, the enactment of privacy-related legislation on both the federal and state levels.

## The Class is Deprived of the
## Benefit of the Bargain

33. Protection of Personal Information is fundamental to the Retail Customers' use of Pershing as a clearing and data management service provider. Retail Customers reasonably expected, and Pershing represented, that the necessary measures would be implemented to safeguard Personal Information.

34. In connection with its services, Pershing provides disclosure statements to its Retail Customers regarding the respective obligations of their Financial Organizations and Pershing ("Disclosure Statement"). The Disclosure Statement (a representative example of which is attached hereto as Exhibit 1) states that the services provided to a Retail Customer are performed under a written Clearing Agreement between Pershing and the Retail Customer's Financial Organization ("Clearing Agreement"). *See* Exhibit 1, p.1. The Clearing Agreements are in the possession of Pershing and other third parties. However, a copy of what is believed to be a representative example of the Clearing Agreement used by Pershing is attached hereto as Exhibit 2.

35. In the Disclosure Statement, Pershing states to Retail Customers that it is "responsible for the services provided at the request or direction of your financial organization as contemplated by the Clearing Agreement." *See* Exhibit 1, p.2.

- 11 -

36.     The assumed responsibilities that Pershing owes Retail Customers include the

creation of computer-based account records, process orders for the sale or purchase of securities,

preparation and transmittal of trade confirmations, holding securities and cash, disbursing dividends

and interest, and providing written reports of all transactions processed for accounts. *See* Exhibit 1,

p.2.

37.     The Disclosure Statement explicitly adopts a privacy policy that, as Pershing readily

acknowledges, applies for the benefit of the Retail Customers. *See* Exhibit 1, p.13.

38.     The privacy policy in Pershing's Disclosure Statement reads, in pertinent part, as

follows:

> Working on behalf of your firm, Pershing recognizes the importance of protecting the confidentiality of nonpublic personal information (NPPI) that it collects about its customers. The information is used to ensure accuracy in reporting and record keeping, maintain its customers' accounts, and effect requested transactions. A top priority for Pershing is to keep this information secure.
>
> 1.     Pershing collects nonpublic personal information from the following sources:
>
> ■     Applications or other forms (obtaining name, address, Social Security number, assets, and income);
>
> ■     Customers' transactions with Pershing, their firms, or others; and
>
> ■     Consumer reporting agencies (obtaining credit worthiness and credit history).

*See* Exhibit 1, p.13

39.     With respect to the manner in which Personal Information is secured or protected by

Pershing, the Disclosure Statement adds the following:

> Internal data security policies restrict access to nonpublic personal information to authorized employees. Pershing maintains physical, electronic, and procedural safeguards that are designed to comply with federal standards to guard NPPI.

\*          \*          \*

Pershing does not disclose NPPI about former customers, except as permitted or required by law.

*See id.*

40. Plaintiff and the Class entrusted their Personal Information to Pershing – directly or indirectly through their Financial Organizations – in exchange for assurances that Pershing would not allow Personal Information to be compromised or be placed at risk by inadequate security policies and safeguards.

41. Despite its assurances and representations to the contrary, Pershing has placed the Personal Information of the Retail Customers at perpetual risk, thereby depriving Plaintiff and the Class of the "benefit of the bargain."

## Defendant Utilizes a Greater Level of Security to Protect Its *Own* Proprietary Information Than It Utilizes to Protect Personal Information on NETX-Pro

42. Pershing maintains its own proprietary information, including, for example, internal corporate documents and other valuable corporate information, with greater care than it maintains Retail Customers' Personal Information. Pershing has the knowledge and technology to supply the equivalent level of safeguarding of Personal Information, maintained and/or accessible through NETX-Pro, as it does its own internal information.

43. Pershing utilizes a variety of heightened or sophisticated security measures for its own proprietary confidential information systems. The implemented security measures are employed in connection with Pershing's End-User authentication, network access and controls, as well as End-User device management and controls.

44. Furthermore, access to Defendant's proprietary information requires either: (1) a company-owned device, which includes local device encryption, enhanced and regularly updated security features and protocols; or (2) remote access or virtualization software (*e.g.*, Citrix Systems),

- 13 -

which enables an End-User to access information through a "virtual desktop image" on a personal or public device. As a result of these and other security measures, Defendant's proprietary information is not maintained in unencrypted form on Off-Site Devices.

45.     In stark contrast, these security protocols are not in place for the NPPI maintained on NETX-Pro. Specifically, NETX-Pro allows unencrypted data to be stored or maintained on Off-Site Devices in violation of Massachusetts Privacy Standards and industry norms.

46.     Defendant clearly possesses (and/or has access to) the knowledge and technology needed to adequately safeguard Retail Customers' Personal Information. Defendant can adopt the security measures used to protect its own proprietary information and in-house data for use with NETX-Pro. Indeed, Pershing is contractually obligated to Financial Organizations to provide that same level of security. *See* ¶82, *infra.* Instead, Defendant utilizes inadequate or deficient security measures in connection with the management of end-point data containing Personal Information of Retail Customers. The lack of adequate end-point data controls violates both industry standards and the requirements of the Massachusetts Privacy Standards.

## Defendant's Failure to Provide
## Notice to Plaintiff or Members of the Class

47.     Despite the massive number of breaches of security which have invariably occurred with NETX-Pro, Pershing has not provided notice of said breaches of security to the Retail Customers or the Attorney General of Massachusetts, as required by Mass. 93H, §3. Additionally, upon information and belief, Defendant has failed to disclose to Financial Organizations, as well as Retail Customers, the known security deficiencies associated with the use of NETX-Pro.

48.     Upon information and belief, Defendant's failure to make the required notifications or disclosures was the product of concerns about reputation and profitability. From a business standpoint, any perceived toxicity in the NETX-Pro platform would be disastrous to Pershing's

- 14 -

preeminence as a clearing house on the NYSE and elsewhere and would destroy its core business model. These violations of state and federal law, if known, would cause substantial reputational and legal risks to Pershing and its parent, BNY, and materially impair the market perception of their products, thereby negatively impacting the value of BNY's publicly traded shares.

## CLASS ACTION ALLEGATIONS

49.    This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff brings this action against Defendant both in her individual capacity, and in her representative capacity as a member of the Class, on behalf of all persons in the United States whose Personal Information is or was maintained on an account with a broker, investment advisor, or directly with BNY, its affiliates or subsidiaries that utilizes or utilized Defendant's clearing or financial services and/or subscribes or subscribed to the use of NETX-Pro, directly or indirectly, during the six years immediately prior to the filing of this action. The Class consists of those persons who were or are Retail Customers (as defined in ¶10, *supra*); subject to any exclusions set forth in ¶51, *infra*.

50.    In the alternative, pursuant to Rule 23(c)(5) of the Federal Rules of Civil Procedure, Plaintiff seeks to represent a subclass of persons currently residing or that have resided in the Commonwealth of Massachusetts and whose Personal Information is or was maintained on an account with a broker, investment advisor, or directly with BNY, its affiliates or subsidiaries, that utilizes or utilized Defendant's clearing or financial services and/or subscribes or subscribed to the use of NETX-Pro, directly or indirectly, during the four years immediately prior to filing of this action (the "Massachusetts Sub-Class").

51.    Excluded from the Class or the alternative Sub-Class are Defendant, including any entity in which Defendant has a controlling interest, or which is a parent or subsidiary of, or which is

- 15 -

controlled by, Defendant, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, or assigns of Defendant.

52.     The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery. Plaintiff believes, however, that there are in excess of five million members of the proposed Class, including both current and past Retail Customers and members of their families who may have been named as beneficiaries or joint Retail Customers and whose NPPI was entrusted, either directly or indirectly, to Defendant.

53.     Common questions of law and fact exist as to all Class members and predominate over any questions which affect only individual Class members. These common questions of law and fact include:

        (a)     Whether Defendant subjected the Personal Information of Plaintiff and members of the Class to violations of Massachusetts Privacy Standards;

        (b)     Whether Defendant failed to exercise the requisite standard of care to protect the Personal Information of Plaintiff and the Class;

        (c)     Whether Defendant misrepresented to the general public the safeguards associated with its products and services or failed to disclose material facts associated with its product and services;

        (d)     Whether Defendant took reasonable and required measures to safeguard the Personal Information of Plaintiff and the Class;

        (e)     Whether Defendant owed a duty to Plaintiff and the Class to protect their Personal Information;

- 16 -

(f)     Whether Defendant breached its contractual obligations to Plaintiff and the Class;

(g)     Whether Defendant breached its common law or statutory duties or obligations to Plaintiff and the Class;

(h)     Whether Defendant was negligent in the manner in which it discharged its contractual obligations to Plaintiff and the Class;

(i)     Whether Defendant acted in reckless disregard of the duties or obligations owed to Plaintiff and the Class;

(j)     Whether Plaintiff and the Class received services from Defendant which are of a lesser value than those bargained for;

(k)     Whether Defendant has been unjustly enriched through its conduct toward Plaintiff and members of the Class;

(l)     Whether the laws of the Commonwealth of Massachusetts, and to the extent applicable, substantially similar laws of other states, were violated by Defendant, by engaging in the acts alleged and described herein; and

(m)     Whether Plaintiff and the Class have sustained damages, and, if so, what is the proper measure of damages

54.     Plaintiff's claims are typical of the claims of the Class she seeks to represent in that Plaintiff and each Class member sustained, and continue to sustain, damages arising from Defendant's wrongdoing. Plaintiff's damages, as well as the damages of each Class member, were proximately caused by Defendant's wrongful conduct as alleged herein and were otherwise foreseeable.

55. Plaintiff will fairly and adequately protect the interests of those Class members she seeks to represent and has no interests that are antagonistic to the interests of any other Class member. Plaintiff has retained counsel who have substantial experience and success in complex litigation, including the litigation of class actions and consumer protection claims, and privacy protection claims in the class action context.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable. Furthermore, because the damages suffered, and continued to be suffered, by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

57. In addition, the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

## COUNT I

### Violation of Mass. 93A

58. Plaintiff repeats and realleges each and every allegation set forth in ¶¶1-57 above as if fully set forth herein.

59. At all relevant times, Defendant is and has been engaged in a "trade" or "commerce" as those terms are used in Mass. 93A.

60. At all relevant times, Plaintiff and members of the Massachusetts Sub-Class were persons, other than persons entitled to bring an action under Mass. 93A, §11, who were injured by

- 18 -

Defendant's use or employment of a method, act or practice declared unlawful under Mass. 93A, §2 or any rule or regulation issued thereunder and, in addition, were acting as consumers in the conduct of Defendant's trade or commerce.

61. As set forth above, Defendant engaged in unfair or deceptive trade practices by: (a) falsely marketing NETX-Pro as containing all required safeguards for maintaining the privacy of the Personal Information of Plaintiff and the Massachusetts Sub-Class or, in the alternative, willfully failing to disclose material facts regarding the known security deficiencies of NETX-Pro; (b) failing to comply with existing rules, regulations or laws of Massachusetts meant for the protection of the public and consumers; and (c) violating the FTC Act or other federal consumer protection statutes within the purview of Mass. 93A, §2, all in violation of 940 C.M.R. 3.16.

62. The false representations regarding NETX-Pro and the material facts willfully withheld regarding its known security deficiencies were of a nature and quality so as to likely affect the decision of Plaintiff and the Massachusetts Sub-Class to utilize the data management and clearing services of Pershing and to choose brokers and financial advisers that utilize NETX-Pro. Defendant's conduct was deceptive in that it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted.

63. Defendant had knowledge or reason to know that the false representations or non-disclosure of material facts regarding NETX-Pro violated Mass. 93A, § 2.

64. As a proximate result of Defendant's unfair and deceptive trade practices, Plaintiff and the Massachusetts Sub-Class have suffered a legally cognizable loss or injury in that their Personal Information, contrary to Defendant's assurances, has been compromised and exposed to innumerable breaches of security as defined by Mass. 93H. Further, Defendant has caused Plaintiff and the Massachusetts Sub-Class to lose the "benefit of the bargain" as set forth in ¶¶33-41, *supra.*

65. Defendant's conduct has placed Plaintiff and the Massachusetts Sub-Class in a worse and more vulnerable position than they would have been in had Defendant employed the privacy safeguards as promised and as required by 201 C.M.R. 17.00, *et seq.* The losses sustained by Plaintiff and the Massachusetts Sub-Class are directly attributable to Defendant's deceptive conduct and were entirely foreseeable.

66. Defendant charged Financial Organizations various fees for services rendered to the Class under the Clearing Agreements. In turn, these fees have been passed on to the Retail Customers. The Massachusetts Sub-Class seeks restitution of that portion of the fees passed on to the Class which represents the difference in value between Pershing's services as advertised and the value of the services actually rendered. Alternatively, the Massachusetts Sub-Class demands disgorgement of all profits on fees charged by Pershing since the decision to use NETX-Pro by Retail Customers acting through their Pershing-serviced Financial Organizations was proximately caused by Defendant's underlying unfair and deceptive trade practices.

67. With respect to Plaintiff and the Massachusetts Sub-Class, the unfair and deceptive acts of Defendant occurred (and continue to occur) primarily and substantially in Massachusetts as follows:

(a) The false representations regarding NETX-Pro were made to the Massachusetts Sub-Class in Massachusetts;

(b) The decision by members of the Massachusetts Sub-Class to utilize Defendant's services, either directly or indirectly through their Pershing-serviced Financial Organizations, occurred in Massachusetts;

(c) The loss of the "benefit of the bargain" by the Massachusetts Sub-Class occurred in Massachusetts;

- 20 -

(d)     The violations of the Massachusetts Privacy Standards occurred in Massachusetts; and

(e)     The injuries sustained by the Massachusetts Sub-Class occurred in Massachusetts.

68.     Plaintiff Katz, in her individual capacity, has suffered or is likely to suffer out-of-pocket losses in the approximate amount of $2,700. Plaintiff has obtained identity theft insurance and credit monitoring services at a cost of $14.99 per month per individual for herself, her husband (a joint tenant on one of her NPC accounts) and her adult son (a named beneficiary on one of her NPC accounts). The projected cost of this insurance for Plaintiff and her two family members at the current rate of $14.99 per month per individual for the next five years is $2,698.20. Additionally, it will be necessary for Plaintiff to expend numerous hours monitoring the forthcoming credit information and reports. Plaintiff seeks the reasonable cost of steps taken and likely to be taken, including the value of her time, to mitigate further damages which may arise from a mishandling of Personal Information in violation of Massachusetts law.

69.     Accordingly, Plaintiff and the Massachusetts Sub-Class are entitled to damages in an amount to be proven at trial, including injunctive relief and double or treble damages as set forth in Mass. 93A.

70.     All conditions precedent to the filing of this complaint have been satisfied, including the mailing and delivery of a demand letter to Defendant on November 1, 2010, a copy of which is attached hereto as Exhibit 3. Defendant responded in writing on December 1, 2010, rejecting any liability and refusing to make any settlement offer.

## COUNT II

### Violation of Unfair Trade Practices Statutes
### Outside of Massachusetts

71.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶1-57 above as if fully set forth herein.

72.    At all relevant times, Defendant is and has been engaged in a "trade" or "commerce" as those terms are used in the Unfair Trade Practices Statutes.

73.    At all relevant times, members of the Class were acting as consumers in the conduct of Defendant's trade or commerce.

74.    As set forth above, Defendant engaged in unfair or deceptive trade practices by falsely marketing NETX-Pro as containing all required safeguards for maintaining the privacy of the Personal Information of members of the Class or, in the alternative, failing to disclose material facts regarding the known security deficiencies of NETX-Pro.

75.    The false representations regarding NETX-Pro and the material facts withheld regarding its known security deficiencies were of a nature and quality so as to likely affect the decision of the Class to utilize the data management and clearing services of Pershing and to choose brokers and financial advisers that utilize NETX-Pro. Defendant's conduct was deceptive in that it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted.

76.    Defendant had knowledge or reason to know that the false representations or non-disclosure of material facts regarding NETX-Pro violated the Unfair Trade Practices Statutes.

77.    As a proximate result of Defendant's unfair and deceptive trade practices, the Class has suffered a legally cognizable loss or injury in that their Personal Information, contrary to Defendant's assurances, has been compromised and exposed to innumerable breaches of security and

- 22 -

potential identity theft. Further, Defendant has caused the Class to lose the "benefit of the bargain" as set forth in ¶¶33-41, *supra.*

78. Defendant's conduct has placed the members of the Class in a worse and more vulnerable position than they would have been in had Defendant employed the privacy safeguards as promised by Pershing. The losses sustained by the Class are directly attributable to Defendant's deceptive conduct and were entirely foreseeable.

79. Defendant charged Financial Organizations fees for services rendered to the Class under the Clearing Agreements. In turn, these fees have been passed on to the Retail Customers (including the Class) of such Financial Organizations. The Class seeks restitution of that portion of the fees ultimately passed on to the Class which represents the difference in value between Pershing's services as advertised and the value of the services actually rendered. Alternatively, the Class demands disgorgement of all profits on fees charged by Pershing since the decision to use NETX-Pro by Retail Customers acting through their Pershing-serviced Financial Organizations was proximately caused by Defendant's underlying unfair and deceptive trade practices.

## COUNT III

### Breach of Contract (Nationwide)

80. Plaintiff repeats and realleges each and every allegation set forth in ¶¶1-57 above as if fully set forth herein.

81. Pursuant to the Clearing Agreements between Pershing and Retail Customers' Financial Organizations and the Disclosure Statement sent to Retail Customers, Defendant is contractually obligated to safeguard the Personal Information of Plaintiff and the Class. Accordingly, Plaintiff and the Class are intended third-party beneficiaries of the Clearing Agreements.

- 23 -

82.     The Clearing Agreements state, in relevant part, that "Confidential Information" means all data and information submitted to Pershing relating to customers of Financial Organizations, "including Non-Public, Personal Information as defined in the Securities and Exchange Commission Regulation S-P." *See* Exhibit 2, Section 24.1. The Clearing Agreements further obligate Pershing to hold such personal information in confidence "to the same extent and in at least the same manner as [Pershing] protects its own confidential or proprietary information," except as otherwise discloseable by law. *Id.* at Section 24.2. The Disclosure Statement (¶¶34-39, *supra*) establishes the clear and manifest intent of Pershing and Retail Customers' Financial Organizations that the confidentiality provisions of the Clearing Agreement, with respect to customer Personal Information, primarily and directly benefit Plaintiff and the Class, notwithstanding any purported attempt to limit the benefits of the Clearing Agreement to its signatories.

83.     Defendant breached its third party contractual obligations to Plaintiff and the Class by failing to protect the Personal Information of Plaintiff and the Class to the same extent and in at least the same manner as Pershing protects its own confidential or proprietary information. The value of services actually provided by Pershing was less than the value of services that Pershing was obligated to provide to Plaintiff and the Class. Thus, as a proximate result of Defendant's breach, Plaintiff and the Class have been damaged and injured.

## COUNT IV

### Breach of Implied Contract (Nationwide)

84.     Plaintiff repeats and realleges each and every allegation set forth in ¶¶1-57 and 81-83 above as if fully set forth herein.

85.     An implied-in-fact contract existed between Pershing and Plaintiff and the Class based upon the acts and conduct of the parties and arising by implication from the circumstances

which manifest a mutual intention to contract with each other even in the absence of a formal agreement.

86.     Pershing's website (¶21, *supra*) sets forth various representations by Pershing to Plaintiff and the Class with respect to maintaining privacy security through "comprehensive security methods, extensive backup systems and well-developed contingency plans."

87.     The Disclosure Statement (¶¶34-39, *supra*) further assured Plaintiff and the Class that Pershing maintains "stringent physical, electronic, and procedural safeguards" and that "[i]nternal data security policies restrict access to nonpublic personal information." Exhibit 1, p.3.

88.     Independent of any third party beneficiary obligations owed by Defendant to Plaintiff and the Class under the Clearing Agreements, an implied contractual relationship existed between Defendant and Plaintiff and the Class with respect to securing the confidentiality of the Retail Customers' Personal Information.

89.     Defendant breached the terms of the implied contract by failing to protect, as promised, the Personal Information of Plaintiff and the Class. The value of services actually provided by Pershing was less than the value of services that Pershing was obligated to provide to Plaintiff and the Class. Thus, as a proximate result of Defendant's breach, Plaintiff and the Class have been damaged and injured.

## COUNT V

## Negligent Breach of Contractual Duties (Nationwide)

90.     Plaintiff repeats and realleges each and every allegation set forth in ¶¶1-57 and 81-83 above as if fully set forth herein.

91.     It was foreseeable to Defendant that Plaintiff and the Class would likely rely on Pershing to perform its contractual duties as set forth in both the Clearing Agreements and Disclosure Statement; contractual duties that obligated Defendant to maintain Retail Customer

confidentiality. Plaintiff and the Class would be harmed if Pershing negligently performed those contractual duties.

92.     Accordingly, Defendant owed a duty to Plaintiff and the Class to act with the ordinary care of reasonableness in discharging its contractual obligations to safeguard the Personal Information of Plaintiff and the Class as set forth in both the Clearing Agreements and the Disclosure Statement.

93.     The standard of care owed to Plaintiff and the Class arises from representations made by Defendant, established and accepted technology, and industry standards, as well as related laws and regulation.

94.     Defendant breached the standard of care and acted negligently with respect to its contractual duty to adequately protect or safeguard the Personal Information of Plaintiff and the Class: (a) in the same manner that Pershing protects its own proprietary information; or (b) as otherwise required by the standard of care.

95.     As a proximate result of Defendant's negligence, Plaintiff and the Class have been damaged and injured.

## COUNT VI

### Unjust Enrichment (Nationwide)

96.     Plaintiff repeats and realleges each and every allegation set forth in ¶¶1-57 and 85-89 above as if fully set forth herein.

97.     Defendant charged the Financial Organizations various fees for services rendered to the Class under the Clearing Agreements. In turn, these fees were passed on to the Retail Customers. The Class seeks restitution of the portion of the fees passed on to the Class, which represents the difference in value between Pershing's services as advertised and the value of the services actually rendered.

- 26 -

98.    Alternatively, the Class demands disgorgement of all profits on fees charged by Pershing since the decision to use NETX-Pro by Retail Customers, acting through their Pershing-serviced Financial Organizations, was proximately caused by the underlying unfair and deceptive trade practices.

99.    At the expense of Plaintiff and the Class, Defendant has received fees and profits for services not fully rendered. Those fees and profits should be refunded to Plaintiff and the Class.

100.   By virtue of the foregoing, Defendant has been unjustly enriched in an amount yet to be determined and Plaintiff and the Class are entitled to restitution of said amount.

## COUNT VII

### Equitable Relief (Nationwide)

101.   Plaintiff repeats and realleges each and every allegation set forth in ¶¶1-57 above as if fully set forth herein.

102.   Personal Information of Plaintiff and the Class is currently being maintained by Defendant.

103.   Through the relationship between the parties, Defendant is obligated to maintain the security of Personal Information belonging to Plaintiff and the Class.

104.   During the Class Period, Defendant breached these obligations by exposing the Personal Information of Plaintiff and the Class to innumerable breaches of security.

105.   No adequate remedy at law exists to address the ongoing exposure of the Personal Information of Plaintiff and the Class members due to Defendant's actions or inactions.

106.   Accordingly, Plaintiff, on behalf of herself and the Class, requests the following equitable relief:

(a)    A judicial determination and declaration of the rights of Plaintiff and the Class and the responsibilities of Defendant with respect to the remains that are the subject of this action;

(b)     That Defendant be enjoined to remedy the known deficiencies of NETX-Pro, including ceasing the practice of allowing unencrypted Personal Information to be stored on unsecured computers;

(c)     That Defendant notify the Financial Organizations and Retail Customers of the security deficiencies of NETX-Pro and that Retail Customer Personal Information has been compromised;

(d)     That Defendant undertake the necessary steps to delete the Personal Information of Plaintiff and the Class from the hard drives of all unsecured computers and devices that received data transmissions through NETX-Pro; and

(e)     That Defendant be determined and declared to be financially responsible for the costs and expenses of remedying the exposure of Personal Information of Plaintiff and the Class, including, for example, the cost of credit monitoring and protection against identify theft and other forms of fraud.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests the following relief, on behalf of herself and the Class:

A.     Certification of this action as a class action, appointment of Plaintiff as a Class representative and the undersigned counsel as Class counsel;

B.     An award of equitable, injunctive and declaratory relief described herein, including judicial supervision of Defendant and a judicial determination of the rights and responsibilities of the parties regarding the remains that are the subject of this action;

C.     An order declaring the actions complained of herein to be in violation of the statutory and common laws set forth above, including a preliminary injunction enjoining Defendant from further acts in violation of Mass. 93A and the Massachusetts Privacy Standards, pending the outcome of this action;

- 28 -

D.     An order enjoining and restraining Defendant from any further acts in violation of the statutory and common laws set forth above;

E.     An order requiring Defendant to take the necessary measures to adequately secure the NETX-Pro system and protect the Personal Information of its clients' Retail Customers;

F.     An award of compensatory damages in an amount deemed appropriate by the trier of fact against Defendant, including, but not limited to, the cost of credit monitoring services and identity theft protection for Plaintiff and the Class, as well as the value of the time likely and reasonably to be spent by Plaintiff and members of the Class in reviewing such credit monitoring information;

G.     An award of compensatory damages in an amount deemed appropriate by the trier of fact against Defendant, including, but not limited to, the monetary difference between the value of Pershing's services as advertised and the value of services as actually rendered; or, in the alternative, the disgorgement of all profits earned from servicing the accounts of Plaintiff and the Class;

H.     An award of double or treble damages against Defendant, pursuant to Mass. 93A;

I.     An award of prejudgment and post-judgment interest;

J.     An award of costs, including, but not limited to, discretionary costs, attorneys' fees and expenses incurred in prosecuting this case; and

K.     Any other and further relief to which Plaintiff and the Class may be entitled at law or in equity that this Court deems just and proper.

## JURY DEMAND

Plaintiff and the Class demand a trial by jury on all issues so triable.

DATED: *DEC 23, 2010*

LAW OFFICES OF CALVACCA MORAN
STEPHEN J. CALVACCA
Massachusetts Bar No. 656143
SUSAN L. MORAN
Massachusetts Bar No. 548566

STEPHEN J. CALVACCA

P.O. Box 1334
66 Frazar Road
West Falmouth, MA 02574-1334
Telephone: 508/540-9911
calvaccamoran@cape.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
MARK T. MILLKEY
MARK S. REICH
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
mmillkey@rgrdlaw.com
mreich@rgrdlaw.com

*Attorneys for Plaintiff and the Class*

- 30 -